Well, Counsel, you have substantially less of an audience, but we're prepared to proceed. Thank you, Your Honor. I'm not worried about the audience. May it please the Court, Roger Dreyer, I represent my client, Stacey Weber. This is certainly not as interesting as what you've just been subjected to. It doesn't have the same level of import in the sense of maybe our society and our country. But this case is an extremely important case because it deals with the very fabric of trying cases and the importance for district courts to make sure that cases are tried fairly and justly and that justice is served. I've been doing this a long time, and this is a very painful case to bring before you because the last thing I want to do is be in front of the court complaining about a jury and talking about the unfairness and the equity of what they did. And this case was permeated by bias and improper conduct and facilitated by rulings that were in error. And as a result, it was a grossly unfair verdict. And what I am here to talk to you about today is the importance for you. I mean, this is why this Court's in place. It would be very easy to simply say, okay, the jury made a decision, Mr. Dreyer, that's just the way it is. But this was the clear way that the evidence here demonstrates just how wrong this verdict is. And I was there. There are three things that demonstrate that this case should be sent back to the district court. One is the jury verdict is completely contrary to the law. If you look at the three key factors in the excerpts from the record, would be tab 31, 38, and 39. 31 is this document where they agree to medical treatment and care and the cost of medical treatment. They're conceding the relationship. They're conceding the injury. This is not a, as characterized by counsel in their brief, a minor rear-end accident. I have a client who stopped on the road who's rear-ended by a 75- Well, they conceded the $15,000 or whatever. The jury was told that the party stipulated those were the past medical injuries, right? Yes, ma'am. So you agreed to that. They agreed to that. So what's your beef? What's my beef is that- About that. I mean, you both agreed to that. So the jury got that. There's no beef, Your Honor. The fact is that that is medical care and treatment for injuries to her neck and back, along with injuries to her head, which the jury found. But it's primarily for the neck and back. Okay, but there was not- All right, they conceded liability also, that they rear-ended your client. So that was not before the jury wasn't deciding that. But I didn't read the stipulation to say we agree that we're responsible for back and head injuries. Your Honor? I read the stipulation to say these are the past medical injuries. These are the past medical expenses that were incurred for treatment for neck and back injuries. The very nature of the medical records, if you look at that particular document- Okay, so that's an amount. But that isn't, we agree, that she has-I mean, the whole trial was about fighting about her back and her head. Actually not, Your Honor. The whole trial was fighting about her head and her brain. They accused her of being manipulating, and they accused her of overstating her brain injury, which the jury found that she did suffer. And they, if you look at Mr. Custer's closing argument, and if you look at the discussion during the course of this trial, and you look at the stipulation, they are stipulating that she suffered a neck and back injury because why would you stipulate to injuries rather for treatment for injections and care and treatment of the neck and the back unless you were not agreeing that the neck and back were injured? There would be no reason to do it. And their comment in the brief that we did it for saving time is completely erroneous. That's not what happened. And if you read Custer's closing argument, he concedes it. And if you look at, as you proceed through this case, and you look at the-that's the first step. And you look at those first six questions. After the jury on its verdict has found those medical bills, and they're modest medical bills, for sure. There were substantial medical bills. She had spine surgery. Every single physician that treated her related these conditions to being hit from behind and then pushed in front of the vehicle in front. So she had two impacts. There were two impacts. And every doctor thought it was related, including their doctor. They all said, now, there's the quality. How big is it? They wanted to argue soft tissue. If this jury had said she'd suffered a neck injury, she'd never had a complaint of neck pain ever before, and awarded her $10,000, I would not be here. If they-if they- But didn't-but didn't-okay. I know that you challenge whether the biomedical expert should have been allowed to testify. Yes, ma'am. But was-did not the biomedical expert that testified say that he didn't think that- Yeah. That-okay. Completely- So I guess what I'm-I guess what I'm just saying, I mean, you can argue all of those things independently. But I didn't see anywhere where the other side conceded or that the jury was advised, all right, that the defendants have conceded liability for the cause of the accident. They have also conceded that as a result of that, her back was injured and her head was injured. And so you just decide how much for all of that. Your Honor, if you look-if the court looks at the closing argument by defense counsel, that's- Not closing argument. I want to know what the jury was told. Did they say that those-because during the trial, you and Mr. Custer, you know, contested everything about-all of the evidence was, well, she had had a prior back injury. Then she had two years where she apparently was asymptomatic. And then she gets in the accident. And then-and then you call experts that say, we think that she got, you know, re-injury and exacerbation. Your Honor, first, I apologize. I meant to reserve five minutes of my time. All right. Okay. For the-for rebuttal. Absolutely. Secondly, the evidence is not that she went two years without having problems. That is not the evidence. And what I'm referring to, Your Honor, is in his closing argument, he concedes that you should be awarding something for her soft tissue injuries. He's-he's minimizing her injuries for certain. The problem is when you have a jury say zero, no award, despite the fact that they concede that there's an injury, they concede the medical expenses, and Dr. Knapp is not a medical doctor and he's wholly unqualified. And if you look at the ruling- Can I step back just- Sure. You opened your argument by saying that the verdict was against the law. And what I took you to mean by that is that the jury verdict was against the evidence and your motion for a new trial should have been granted. And so what we need to do is look at the trial record and determine whether or not there was sufficient evidence for the jury to find. And whether or not, as you just said, there should not have been damages on the back injury, notwithstanding the stipulations and agreements you made prior to the trial. Correct. All right. So as we must look at the trial record or at least the evidence in the light favorable to the defendant on that issue, is there some room for us to- I guess a better question would be what is your response to the question, is there an alternative ground for the jury finding? For instance, there's evidence, as I understand it, that your client had a prior back injury. Yes, there was a stipulation. Yes, Mr. Custer made that admission at closing argument. But isn't there some room to look at the verdict in the light that they had some evidence of prior injury or something alternative that would justify no damages on those injuries? Judge Murphy, absolutely not. There's no evidence of that. The last time this woman occasionally, very rarely saw a chiropractor when she overworked in the backyard or something of that nature. Never missed a day of work. Never missed an activity. Every single lay witness that came in, it's uncontroverted. The last time she saw a chiropractor was two years before the incident. There was never an injury. And the last time she saw a regular doctor was 13 months before the incident. He took an x-ray of her back and there was no referral for anything. No specialists, no nothing. She's 40 years old. There's no question that she's got a 40-year-old spine, but she has no limitations on her in any regard. That zero is a direct result of the way in which this case was conducted. It's the direct result of the attack on myself and on my client, taking things completely incorrectly, out of context, and making things up. And one of the things to follow up on Judge Callahan's mention about the Dalbar issue with Dr. Knapp, if you read in tab 42 of the excerpts, on page 464, this is Judge Shub's ruling. And he's talking about what he's doing and why he's doing it. He says, Dalbar tells us that the district judges are supposed to be the gatekeepers, but the standards that they set out are so flexible and imprecise that it opens the door for appellate review no matter which way a court goes on a question like this. He goes on to read down here, this second paragraph, so Mr. Dreyer, as a practical matter, if I keep it out and you win, and you will likely be on appeal, and we don't know what the Court of Appeals will do. But if you win, you're going to have to wait to recover, and you run the possibility that your victory is going to be set aside. You have to try the case again. You're going to win this case, you know. There's no way around that because they've stipulated a liability. They're going to get at least your past medical expenses, and you're going to get something for non-economic loss. And I'm going to be, and it's going to be a lot more if I keep this out. That's what he says. He specifically makes the decision, and if you read the rest of it, I say, listen, Judge, don't worry about taking care of me and taking care of the record, and we'll wait for the verdict. We'll wait for the appeal. This gentleman, Mr. Knapp, was, has absolutely no scientific basis to what he did. He was allowed to comment on the actual issue of fact here. He was allowed to testify she didn't suffer brain injury, she didn't suffer neck injury, she didn't suffer back injury. He did nothing scientifically. Nothing. This, he did, was not subjected, and if you look at the record, Judge Shub repeatedly tried to help Mr. Custer qualify him just so minimalistically, but he never set forth his, his. Okay. I can hear pretty well from here. Sorry, Your Honor. I apologize. That's fine. You can dial that back a little. But, okay, that, if that is, all right, I think that may be your strongest point here, but we do review it for abuse of discretion. Yes, ma'am. And I saw Judge Shub going, you know, he reviewed all the cases, and he basically said some people let it in, some people don't let it in. So, and you pretty strenuously cross-examined this person, and the position was, well, it goes to the weight, not to the admissibility. What's your response to that? My response to that is he allowed him to testify before I put on any of my witnesses in the trial, so now the defense puts on a witness, an expert who supposedly is qualified to talk about the material issue that they're there for, and hear him say to them, while they're hearing constantly, the whole time about the lawyer is crooked and the client is crooked, and now this expert comes on and says she couldn't even have been injured. And he has no scientific basis for it. This isn't an issue where Judge Shub says, you know, some do, some don't. That's not the standard. It's not imprecise. And what's very, I think, educational, Your Honor, on this is that if you look at their reply, they don't even address this topic. They don't talk about Smesler. They don't talk about Borman. They don't talk about any of those cases, because what Judge Shub did was he basically said, you're going to win, I'm going to protect the record for you, and I'm going to let this guy in because it's so bad. But when the jury gets, if you look at the bias on this, and if you look at all the things they did, the issue about this anecdotal comment about wealth, this was such an unfair trial, Your Honor. I apologize. Well, I think you have to take some responsibility on what came in on the evidence, you know, if you say, well, okay, I may not, I'm not going to claim those, I am going to claim those or whatever, and basically it's like, well, if you want to open that door, and you're an experienced trial attorney, you open that door, then, you know, the calvary comes through. And if she was going to say, well, I'm going to try to get my lost, I'm going to try to get my lost, and you know, it's going to come in how much money you make, that you were actually making more money, or that you told the doctor, well, I don't really need to work because I'm flipping houses and all of that. That decision you made knowing what was going to happen. Two things, Your Honor. Number one, she did not say that. She never said that. And the doctor, when he was examined on that, indicated, I don't remember the conversation, I don't remember the context, I don't remember any of it. And they pounded that home time and time again. And secondly, I made the motion to keep out the tax records. Judge Shub made it very clear, I don't like motions eliminating any way, shape, or form, and you can rule on it at the time. I had to make a choice, a tactical decision, because if they're just going to put all the tax returns in about wealth, because this is a couple that worked very hard in the Stockton area before this happened. They worked very hard. Everything they showed on those tax returns is from work they did before, not from work after. She couldn't work. That's the evidence. And so as a result, I did have to put in the evidence about the loss of income, loss of earning capacity. All the tax returns come in, Your Honor, Judge Shub's going to let them in, even though it's Mr. Weber who's not the plaintiff in the case. So it is, I can understand, totally understand, from your perspective, sitting here, you were not in the courtroom, you read that cold transcript, and you want to hold me accountable for what I did? I'm fighting like crazy for my client. It was unfair. We were accused of everything, all the bias, all the tort reform stuff, and they used it. And that jury, there's no – the best evidence you have of that is them putting a zero on the back and a zero on the neck. That's the reality. And I'll reserve the rest of my time. Thank you, counsel. Good morning, Your Honors. Good morning. May it please the Court. Laura Ryan on behalf of Logistics, Inc. So we had to drop the case because you were gone. I'm sorry about that. What happened? I was expecting to be third, so. Well, when court starts at 930, you're supposed to be here from 930 on. I was, Your Honor. You were not here when we called the case. I was. I was in the back row. I just didn't hear because I was expecting – I apologize. I was expecting for us to go third, so I was not as dialed in as I should have been, and I apologize, Judge Rawson. That's really not dialed in. No. I was reviewing my notes and just was not paying attention, and I apologize. Wow. But I got to hear a wonderful, very interesting case as a result. Yeah. Okay. Well, let's – You were not the trial lawyer here. I was not. Mr. Dreyer was. Correct. And – But I'm very familiar with the case, and I supported Mr. Custer throughout the case. I wrote many of the motions, the lemonade, and I'm very familiar with the record. I'm probably most concerned about Dr. Knapp testifying. Sure. Dr. Knapp, plaintiff's counsel understates his background. No, he has a Ph.D. Ph.D. in anatomy. I know. He's qualified to do certain things. Correct. But he – has he ever – he's never seen a patient, right? No, but he reviewed all of the medical records, including the spine records that showed that there was no change in her cervical spine two years prior to the accident and two years after. He reviewed all of the medical records. He has been an expert witness at least 200 times, has never been disqualified. And there's actually a recent – and it appears to me that plaintiff's biggest concern is that he opined on causation. And I just wanted to direct your Honor's attention to a recent case from – talking about that the weight of authority supports the conclusion that the fact that a biomechanical expert is not a medical doctor does not mean that he is not qualified to offer an opinion as to specific causation. Is that an unpublished case? This is an unpublished case, Your Honor, but it cites two published decisions from this circuit and other – excuse me, from the district court cases and also other circuits. And it is a September 9, 2019 case. But the judge, with regard to Dr. Knapp, had a problem equating the documents and the report that he wrote with what he was testifying to at trial and continued to sustain objections on the foundation for Dr. Knapp's testimony. And then inexplicably, after the defense counsel attempted to lay a final foundation, allowed him to testify on almost what was the – what you say, the ultimate issue in the case, which I believe was whether there was a relationship between the event, accident, and any brain injury that Ms. Weber may or may not have claimed to have. Yes, Your Honor, but actually the jury found that there was a brain injury, that she did sustain a head or brain injury. If any, in admitting Dr. Knapp's testimony is harmless? Correct, and also because it's – also harmless because there was an overwhelming amount of evidence that came in that she did not sustain – or, excuse me, that the accident was not a substantial factor in causing injury to her cervical or lumbar spine. With respect to the lumbar spine, there was, as I said, an X-ray pre-accident and post-accident that showed no difference. All it showed was the exact same level of degenerative disc disease. The plaintiff had seen several doctors in 2010 and 2012 for lower back problems, which she referred to – or the doctor referred to as chronic. And all of the doctors, including the plaintiff's orthopedic surgeon expert, agreed that the films were the same, there was no change. With respect to her cervical injury, she had an X-ray done the day after the accident. She had another X-ray done two years later. And again, all of the experts and the treating physicians agreed that there was no change between the two. With respect to the first X-ray, expert testimony came in that there was no evidence of trauma. And importantly, after this accident, she never treated once for cervical injury. She never treated for it. So our position, of course, is that the weight of the evidence was overwhelming, that she did not sustain or that the accident was not a substantial factor. But she testified as to how her life changed. Yes, of course, but that's objective. So that was for the jury to evaluate in terms of. And they did find, and apparently she had some convulsions in her doctor's office at some point. Correct. Correct. And evidence came in, including her own neurologist, that there was no documented evidence of actual seizure activity. They thought maybe it was pseudo seizures, but there was behavioral. But there was never any evidence, documented evidence, that she actually was having seizure activity, actual seizure activity. In fact, she was. Certainly, you didn't do the closing argument, but it certainly seems like counsel was pretty over the top in using things like calculating, planted, and manufactured. I mean, that evidence seemed pretty close to crossing the line, so to speak. I mean, when you think of planting evidence, what evidence was there that he made up evidence? Yeah, I agree with that. That was pretty over the top language. I've seen a lot of aggressive counsel, but counsel calculated the lawsuit, manufactured, planted evidence. Mr. Dreyer knows he manufactured this evidence. I don't, frankly, know what the judge did at that point, but that should not have gone on. With respect to, again, well, first of all, closing argument is not evidence. Well, it's not evidence, but when you accuse your co-counsel of, the calculated doesn't bother me as much as, I mean, lawyers strategize, lawyers do things, but planting and manufacturing are ethical violations, and that would be like police officers stealing from the, like substituting drugs for talcum powder or planting evidence on a witness. I mean, those are fiery words. Sure, I understand, Your Honor, but, again, the evidence supported his argument. Planting and manufacturing? May I explain how that was? Defense hired an expert reconstructionist, accident reconstruction expert, and specifically so that we could, so that the defense could calculate the impact, or excuse me, the delta V, the change in velocity, from the first impact when the truck struck Ms. Weber's vehicle and then the second impact when her vehicle struck the vehicle in front of her. During that deposition, plaintiff's counsel asked for this expert witness, Mr. Braun, to prepare a calculation having to do with the force on the bumper from the truck, and Mr. Braun said, that's not relevant, and he said, you know, please, insisted he do it. Fine, Mr. Braun did it, and then what plaintiff's counsel did was he took Mr. Braun's expert report, stapled to the back of it this calculation that Mr. Braun had said during his testimony was wholly irrelevant, put it in each of the, gave it to each of his experts, that's fine, but then this was the rub. What he did was he then went to plaintiff's treating physician and not to talk with her about the case, not to go over, you know, any of his findings or how the plaintiff was doing, but instead to add, and this was the doctor's testimony, to add this report with the calculation on the back into his record, and our position was that plaintiffs could have hired their own accident reconstructionist. They did not because any accident reconstructionist would have said. So did the accident, did they say that, that they said that? What's that? Did he make up numbers? Did Mr. Dreier make up numbers on that piece of paper or did he use the numbers of your accident reconstructionist? He used the numbers the accident reconstructionist had said were irrelevant, but then in plaintiff's treating physician, not an expert, treating physician's file, the treating physician during testimony said that he did not rely on those numbers and that they were not relevant to his treatment of the plaintiff. But what are you, what was nefarious about that in your view? Do you think that plaintiff's counsel was trying to give the impression to the jury that this was part of the medical, what was nefarious about that? Nefarious was that as opposed to hiring their own accident reconstructionist, they were trying to get in this irrelevant fact, this irrelevant calculation. You equate that to planting evidence? It didn't, if you place in a doctor's chart, in a doctor's case file, evidence that you've already been told is irrelevant, the doctor doesn't rely on it. The court agreed that this evidence was not relevant, that the force of the car was not relevant, and yes, that the placement, yes, was like an extra attempt. By having each of the experts have this figure, this calculation, plaintiff's counsel was able each time to try and get the evidence in, to try and get that calculation, that irrelevant calculation into evidence. So by putting it in the treating physician's file. But does the whole treating physician's file go into evidence? No, Your Honor. It doesn't go into evidence. No, no. It's not like sneaking something into the jury room. I mean, if let's say there was a motion to put the treating physician's report into evidence, and both parties, and your counsel and Mr. Dreyer agreed that it should go in, and then Mr. Dreyer like stamped, then stapled something to it that was not part of the file, that might be planting evidence, but. I understand, Your Honor, that the word planting is strong. So what, so did Mr. Dreyer object when he was accused of planting evidence, or what happened in the closing argument? And what did Judge Shub do? Sustained. Excuse me, overruled. But what I would say is that the standard under review here with respect to misconduct, defense counsel misconduct, is not only does there have to be misconduct, but there also has to have prejudice affected the verdict. It has to affect what the jury did. Right, exactly. And what the jury did was wholly supported by the evidence. So even if there were misconduct, which we disagree with, but even if there were, there's been no showing of prejudice other than the jury verdict, which is wholly supported by the evidence. Anything else? No, Your Honor. All right. Rebaul. Let me deal with this allegation. The calculation, I asked their expert, what's better than to have the defense expert do something and calculate something? I asked him to calculate the force of that speed with this vehicle that the defendant was driving, weighing 75,000 to 80,000 pounds. And I gave that information. I wanted that information to go to the treating doctors and my expert because of the force of that impact. This wasn't a little SUV that hit the back of my client's vehicle. So that's what that was about. But did everyone say it was irrelevant? No. Did the doctor say it was irrelevant? I thought that's what opposing counsel said. Well, opposing counsel said a number of things, Your Honor, that are not right. Number one, she says that the prior, there was X-rays of the cervical spine. She's never seen anybody for her cervical spine. There are no X-rays of her cervical spine. She says that Dr. Pichetti agreed there were no changes in the lumbar spine. That is not what Dr. Pichetti testified to. Dr. Pichetti indicated that this accident accelerated her condition and created a new injury to her lumbar spine. And he monitored it over the course of over a year before he did the surgery. But the jury heard all of that, correct? Yes, they did, Your Honor. And so to me, as a result of hearing that, that's the question I have. When I saw that verdict form and I saw the zeros, and I'm going, how is that possible, especially when the whole attack on my client is that she's manufacturing this brain injury, which her treating neurologist said she had. But they found a brain injury, right? Your Honor, I'm not here on the brain injury, but I would tell you that their verdict was also colored on that by the bias and by the argument of counsel. $300,000 for a 40-year-old woman who can no longer work because she can't have the cognitive executive function that everybody said? I get it. I mean, I question jury verdicts all the time. Just never know what's going to happen when you try a case to the jury. And that's why you have attorneys on both sides, because there are two views of it. And one side is going to think that the jury got it wrong. It's just really difficult. You have a difficult burden to overcome a jury verdict. And here's what I would tell you. I've tried. This is the first time I've ever been in a court of appeal complaining about the size of a verdict. I get that. I've tried a lot of cases, as Judge Callahan knows. This is a zero. That is a number. And for the jury to make that determination, it is so violative of the clear weight of the evidence in this case. So why would they do it? Why would they do that? And all I would suggest, the Ninth Circuit, on its remand with Daubert, the Ninth Circuit has added, and this is from the Smelser case, which they don't even address, the Ninth Circuit has added another factor to assist the court in its inquiry. Whether the experts are proposing to testify about matters growing naturally and directly out of the research they have conducted independent of litigation, or whether they have developed their opinions expressly for the purpose of testifying because the former provides important objective proof that the research comports with the dictates of good science. Dr. Knapp has done nothing. He is strictly a forensic biomechanist who testifies exclusively for the defense. There was nothing. And Judge Murphy is correct. Every time I was forced to object, he should never have been in front of the jury. I'm looking like I'm trying to keep evidence out in front of the jury. And this is before I've even started my case. But I thought opposing counsel said that the jury found in favor of the plaintiff on the issue that Dr. Knapp testified on, that the brain injury, right? Yeah. He testified. He has no background on the brain, zero. And I crossed him on that. But they found there was brain injury. So what was the – I don't understand the prejudice. Well, the prejudice, Your Honor, is on the cervical spine and the lumbar spine. He should never have been allowed to testify on that at all. He didn't qualify. And that information was the only information they had that she didn't suffer a back injury or a neck injury. I mean, I'll give you that when I saw this case involved in 18 Wheeler, I was just like, oh, my gosh, that's really, I mean, a massive force. And Dr. Pichetti took that information. He's got a biomechanical experience because of his background as a spine surgeon. He used that information, utilized it. And the judge, for some reason, just did not like that communication, did not like that calculation and never understood why he had a real problem with it because he was convinced that from whatever source, I have no idea that that wasn't relevant to him, that the force is involved. The last thing I would leave the court with is this. I really, truly appreciate how difficult this task is. I appreciate the fact juries do. You've got to deal with what juries do. I deal with it all the time, good and bad. But she didn't get a fair trial because of the conduct of counsel. She didn't. She didn't get a fair trial because she was subjected to this wealth issue and she was subjected to Dr. Knapp being allowed to testify. In a district court, there's the Kofanis case, K-O-U-F-A-K-I-S, that I cited in my papers, talks about the duties of the district court. And I know Judge Murphy is a district court judge, and he understands that better than anybody. But the reality is — He's a district court judge as well. I understand. I understand. But my point is that the district court judge has that responsibility. And otherwise, justice is not done. We understand. Thank you for your argument. Thank you to both counsel for your argument. The case just argued is submitted for decision by the court. We are in recess until Valentine's Day, 930 a.m. tomorrow.
judges: Rawlinson, Callahan, S.murphyiii